**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Sunwestern Contractors Incorporated, | No. CV-16-00649-TUC-CKJ |
| Plaintiff, | **ORDER** |
| v. | |
| Cincinnati Indemnity Company, | |
| Defendant. | |

      Pending before the Court are the parties' Motions for Summary Judgment (Docs. 58 and 60), Responses (Docs. 67 and 69), and Replies (Docs. 72 and 73).

## Background

      In July 2012, Sunwestern Contractors Incorporated ("Sunwestern") successfully bid on a project with the City of Tucson (the "City") for the construction of a water main collector system (the "Project"). The Project involved the construction of over 17,200 feet of pipeline, with pipe sizes ranging from 16, 24, 30, 36, 48, and 54 inches in diameter. In May 2013, Sunwestern conducted a pressure-test of the pipeline when several flanges (connections between pipe sections that include bolts and gaskets) came apart (the "Incident"). Although 10,000 feet of pipeline was previously pressure tested and accepted by the City, during the May 2013 test, the 48 and 54-inch pipes began to leak. The flange failure caused water to tear out gaskets (seals which fill the space between pipes to prevent leakage), seriously damaging the pipeline, components of the pipeline, and surrounding areas.

Although repairs on those damaged items were still necessary, the City terminated its contract with Sunwestern on November 21, 2013 and opted to complete necessary repairs with a new contractor. The City later claimed that Sunwestern had caused approximately $4,000,000.00 in damages. At this time, Sunwestern was covered by two separate polices from Cincinnati Indemnity Company ("Cincinnati"): a commercial general liability policy (the "CGL Policy") and an umbrella policy (the "UMB Policy"). Sunwestern also secured a performance bond for $4,852,050.25, the full amount of the contract it had with the City.

In January 2014, the City contacted Cincinnati and demanded that Cincinnati cover its claims. Cincinnati investigated the Incident in April 2014 and denied coverage on October 28, 2014, claiming that the Incident did not constitute an "occurrence." (Doc. 59-7, pg. 2-13). The City later successfully made a claim against Sunwestern's performance bond for approximately $2,600,000.00. (Doc. 61-6, pg. 18). Sunwestern claims that Cincinnati improperly denied coverage. Cincinnati claims that Sunwestern is not entitled to coverage.

## Legal Standard

"Summary judgment is appropriate when, viewing the evidence in the light most favorable to the nonmoving party, 'there is no genuine dispute as to any material fact.'" *United States v. JP Morgan Chase Bank Account No. Ending 8215 in Name of Ladislao V. Samaniego, VL: $446,377.36*, 835 F.3d 1159, 1162 (9th Cir. 2016) (citing Fed. R. Civ. P. 56(a)). "[W]here evidence is genuinely disputed on a particular issue – such as by conflicting testimony – that 'issue is inappropriate for resolution on summary judgment.'" *Zetwick v. Cty. of Yolo*, 850 F.3d 436, 441 (9th Cir. 2017) (citing *Direct Techs., LLC v. Elec. Arts, Inc.*, 836 F.3d 1059, 1067 (9th Cir. 2016)). "There is no such issue unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. In essence, the inquiry is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 243 (1986).

Since this is a diversity case, the Court will apply Arizona law. *See Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 416 (1996) (Pursuant to *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938), "federal courts sitting in diversity apply state substantive law and federal procedural law."). To the extent this case raises an issue of first impression, and "in the absence of controlling forum state law, a federal court sitting in diversity must use its own best judgment in predicting how the state's highest court would decide the case." *Takahashi v. Loomis Armored Car Serv.*, 625 F.2d 314, 316 (9th Cir. 1980). "In so doing, a federal court may be aided by looking to well-reasoned decisions from other jurisdictions." *Id.*

## Analysis

Sunwestern and the City dispute their respective responsibility for the Incident. Sunwestern claims that the Incident occurred due to the City's engineering deficiencies. *See* (Doc. 60, pg. 3) ("Sunwestern's position was that Tucson Water's engineering deficiency caused the problem, as it did not establish proper torque values for the bolts, and the red rubber gaskets it selected, were not adequate for the larger pipes."); (Doc. 58, pg. 12) (The City's position is that Sunwestern's "improper torqueing of bolts" led to the flange failures). There is no dispute that the Incident resulted from the inadequate installation of pipe components. Whether that inadequate installation was due to the City's improper engineering or Sunwestern's own improper construction is immaterial for purposes of this summary judgment motion. Ultimately, the work was faulty and will be treated as such.

As has been previously noted, Sunwestern was covered by two separate policies during the time of the Incident: the CGL Policy and the UMB Policy. The Court will first address coverage under the CGL Policy, then address coverage under the UMB Policy in a separate section.

With respect to the type of damages covered, the CGL Policy provides, in pertinent part:

We will pay those sums that the insured becomes legally obligated to pay as

damages because of "bodily injury" or "property damage" to which this insurance applies.

This insurance applies to "bodily injury" and "property damage" only if: (1) The "bodily injury" or "property damage" is caused by an "occurrence."

"Property damage" is defined as:

a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

"Occurrence" is defined as:

An accident, including continuous or repeated exposure to substantially the same general harmful conditions.

(Doc. 59-1, pg. 20).

### 1. Was There an Occurrence?

The threshold question is whether the Incident constitutes an occurrence as defined by the CGL Policy. If the Incident was not an occurrence, the Court need not analyze further since the CGL Policy only provides coverage for "occurrences." Arizona courts have previously held that faulty workmanship, standing alone, is not an occurrence. *See U.S. Fid. & Guar. Corp. v. Advance Roofing & Supply Co.*, 788 P.2d 1227, 1233 (Ariz. Ct. App. 1989) ("In our opinion, the better reasoned authorities hold that mere faulty workmanship, standing alone, cannot constitute an occurrence as defined in the policy, nor would the cost of repairing the defect constitute property damages.").

However, subsequent cases note the "distinction between faulty workmanship standing alone and faulty workmanship that causes damage to property." *Lennar Corp. v. Auto-Owners Ins. Co.*, 151 P.3d 538, 545 (Ariz. Ct. App. 2007), rev'd, 256 P.3d 635 (Ariz. Ct. App. 2011). Therefore, the relevant inquiry is whether the Incident was faulty workmanship, standing alone, or whether it was faulty workmanship that resulted in property damage.

The Court finds it helpful to provide an illustrative example. Company X builds a home but installs the roof shingles in a careless manner. The roof eventually begins to leak, causing water damage to the house's wood flooring. Since the faultily constructed roof caused property damage (water damage to the floor), that incident is an occurrence. *See id.* ("Thus, the damage caused by the faulty work, not the faulty work itself, constituted an occurrence, and where no property damage was alleged as a result of the faulty work, there was no occurrence."). If the roof was faultily constructed, but never began to leak and never caused damage to the floor, it would not be an occurrence because "faulty workmanship, standing alone, cannot constitute an occurrence." *Advance Roofing & Supply Co.*, 788 P.2d at 1233.

Cincinnati maintains throughout its briefing that the Incident does not constitute an occurrence because the "damages claimed by the City related only to the cost of repairing and completing faulty work performed by Sunwestern. There was no claim for damage to 'other property' or for damage to other portions of the Project built by others. Thus, there was no 'occurrence' and, if there were, the 'your work' exclusion would apply defeating coverage." (Doc. 58, pg. 9); *see also* (Doc. 72, pg. 7) ("Here, it is undisputed that the damages claimed by the City relate only to the cost of repairing faulty work performed by Sunwestern, and completing Sunwestern's unfinished work. There was no claim for damage to 'other property' or for damage to other portions of the Project built by others. Thus, there was no 'occurrence' under Sunwestern's CGL or UMB policies.").

Cincinnati's argument fails. The relevant inquiry is not whether there was damage to "other property" or damage to "other portions of the Project built by others." The relevant inquiry is whether Sunwestern's faulty workmanship resulted in property damage – and it is uncontroverted that it did. Like Company X's faulty roof leading to water damage to the floor, here, improper installation of pipe components led to damage to the pipeline and surrounding areas. The record establishes that flanges – the connections between sections of pipe including bolts and gaskets – were improperly installed. *See* (Doc. 61, pg. 4) ("When Sunwestern tested the lines and started bringing up the water pressure,

several flanges [pipe connections] came apart. Flanges are the connections between the sections of pipe and include the bolts and gaskets."). Those flanges later failed, causing "damaged gaskets, damaged pipe bedding, and water infiltration. When a gasket would fail, the water in the pipeline would drain into the trench. The water would have to be pumped out and the bedding would need to be replaced." (Doc. 61-6, pg. 47). Even Cincinnati acknowledges that the damage caused by the improperly installed flanges was not limited to the flanges itself. *See* (Doc. 59, pg. 2) ("There was damage to the pipes, flanges, pipe trenches, and pipe bedding, but no damage to property other than the Project.").

This is not a situation where Sunwestern is solely seeking to recover the cost of repairing its own defective work. Sunwestern has made a showing that serious property damage resulted from its defective work and consequential property damage resulting from faulty work is an occurrence under the CGL Policy. *See Double AA Builders, Ltd.*, 386 P.3d 1277 at 1279 ("It is undisputed that Double AA sought to recover only the cost of repairing Advance's defective work, which occurred on premises owned or rented by Harkins. Because Double AA does not seek to recover for damage resulting from the defective work, the 'your work' exclusion bars Double AA's recovery unless the 'subcontractor exception' to the exclusion applies."); *Lennar Corp.*, 151 P.3d at 545 ("In this case, however, unlike in *Advance Roofing*, the Pinnacle Hill plaintiffs alleged damage resulting at least in part from faulty workmanship, including cracks in the walls, baseboard separation, and floor tile grout cracks and separation . . . The Pinnacle Hill plaintiffs, therefore, do not claim faulty work alone; they also claim that property damage resulted from the faulty work. This is sufficient to allege an occurrence under the policies at issue."). The Court finds that the Incident is an occurrence under the CGL Policy.

2.  *Are There Any Applicable Exclusions in the CGL Policy?*

Although the Incident is an "occurrence," coverage may still be precluded based upon any applicable policy exclusions. Cincinnati alleges that exclusions j(5), j(6), and (l) apply to defeat coverage. Sunwestern alleges that those exclusions, when read together,

- 6 -

create an ambiguity, and that "[a]ny ambiguity should be read strictly in Sunwestern's favor." (Doc. 60, pg. 8).

Exclusion j of the CGL Policy precludes "Property damage" to:

(5) That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations;

(6) That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

Paragraph (6) of this exclusion does not apply to "property damage" included in the "products-completed operations hazard".

"Your work" is defined as:

(1) Work or operations performed by you or on your behalf; and

(2) Materials, parts or equipment furnished in connection with such work or operations.

(Doc. 59-1, pg. 24).

*A. Exclusion j(6)*

Exclusion j(6) precludes coverage for incorrectly performed work. However, exclusion j(6) also includes its own exclusion – the products-completed operations hazard. Exclusion j(6) does not apply to property damage included in the products-completed operations hazard, which is defined in the CGL Policy as follows:

"Products-completed operations hazard": a. Includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:

(1) Products that are still in your physical possession; or

(2) Work that has not yet been completed or abandoned. However, "your work" will be deemed completed at the earliest of the following times:

(a) When all of the work called for in your contract has been completed; or

(b) When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site; or

(c) When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

(Doc. 59-1, pg. 24).

Sunwestern summarily dismisses the applicability of exclusion j(6) by claiming that it "does not apply to Completed Operations." (Doc. 60, pg. 12). The Court agrees. Exclusion j(6) explicitly precludes coverage *only* for incorrectly performed work that has not been completed. Therefore, if Sunwestern completed the Project, exclusion j(6) would not apply.

It is important to note that the damage excluded by j(6) appears to be limited only to the faulty work itself and does not exclude damage to non-defective property resulting from faulty workmanship. Specifically, j(6) excludes: "**That particular part of any property** that must be restored, repaired or replaced because "your work" was incorrectly performed on **it**." (emphasis added). The exclusion is limited in scope only to specific property that must be fixed because faulty work was incorrectly performed on *it*. Exclusion j(6) does not exclude coverage for property damage for non-defective property that results from faulty workmanship.

In *Desert Mountain Properties Ltd. P'ship v. Liberty Mut. Fire Ins. Co.*, 236 P.3d 421, 432 (Ariz. Ct. App. 2010), aff'd, 250 P.3d 196 (2011), the Arizona Court of Appeals, interpreting a nearly identical provision to j(6), held:

Consistent with these cases, we hold the Broad Form Property Damages exclusion[1] does not bar coverage of damage to non-defective property resulting from faulty workmanship. By its terms, the exclusion applies only to the repair of "that particular part of any property . . . made . . . necessary

---

[1] This exclusion provides, in pertinent part: "Coverage is not provided for the insured's liability for damage: To that particular part of any property, not on premises owned by or rented to the insured, the restoration, repair, or, replacement of which has been made or is necessary by reason of faulty workmanship thereon by or on behalf of the insured." *Desert Mountain Properties Ltd. P'ship v. Liberty Mut. Fire Ins. Co.*, 236 P.3d 421, 432 (Ariz. Ct. App. 2010), aff'd, 250 P.3d 196 (Ariz. 2011).

- 8 -

by reason of faulty workmanship thereon." Given the narrow scope of the exclusion, we conclude it applies only to the repair of defective workmanship and not to the repair of damage that resulted from the defective workmanship. Because the endorsement excludes only damage to property "by reason of faulty workmanship thereon," the exclusion did not bar coverage of damage to non-defective property resulting from the faulty soil compaction in this case.

Thus, while exclusion j(6) unambiguously excludes coverage for damage to the flanges and other incorrectly constructed portions of the pipeline, if they were not "completed," it does not exclude coverage for consequential damage to non-defective property caused by that incorrectly performed work. *See Mid-Continent Cas. Co. v. JHP Dev., Inc.*, 557 F.3d 207, 215 (5th Cir. 2009) ("[E]xclusion j(6) bars coverage only for property damage to parts of a property that were themselves the subject of defective work by the insured; the exclusion does not bar coverage for damage to parts of a property that were the subject of only nondefective work by the insured and were damaged as a result of defective work by the insured on other parts of the property.").

*B. Exclusion j(5).*

As previously noted, exclusion j(5) excludes coverage for property damage to:

That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations . . .

(Doc. 59-1, pg. 24).

Like exclusion j(6), the Court notes that exclusion j(5) only precludes coverage for work that is still in progress. Although both parties reference exclusion j(5) in their briefings, neither party provides a particularly meaningful analysis of its applicability. In addressing exclusion j(5), Sunwestern claims: "The damage here was to personal property (piping, flanges and gaskets), not real property. Tucson Water does not own all the real property upon which the Tucson Water Project was built (SOF at ¶114(c))." (Doc. 73, pg. 7); *see also* (Doc. 60, pg. 12) ("This claim relates to the damage to personal property, such as the piping, flanges and gaskets. The CGL policy does not define real property. Nor did

Tucson Water own all the real property (SOF at ¶114(c)).". Cincinnati merely recites the text of exclusion j(5) and writes: "The damages the City later sought from Sunwestern was for the cost to repair, replace, and complete the work called for under Sunwestern's contract. Therefore, paragraph (5) of the 'Damage to Property' exclusion applies." (Doc. 69, pg. 12).

Sunwestern lodges no objection to j(5) based upon an ambiguity in the CGL Policy, rather, Sunwestern denies exclusion j(5) applies because it specifically excludes coverage for property damage to "real property" as opposed to "personal property". Sunwestern contends that the damage that occurred was limited to "personal property (piping, flanges and gaskets), not real property." (Doc. 73, pg. 7). The CGL Policy clearly makes a distinction between "real property" and "personal property." For example, exclusion j(4) precludes coverage specifically for "[p]ersonal property in the care, custody or control of an insured." (Doc. 59-1, pg. 24).

Although the CGL Policy makes a clear distinction between "personal property" and "real property," it neglects to provide a definition for either term. In Arizona, undefined words in an insurance contract are defined in the common-sense terms of the average layman rather than in technical terms. *Malanga v. Royal Indem. Co.*, 422 P.2d 704, 707 (Ariz. 1967). The word "real" in "real property" evokes a comparison to the term "real estate." With that phrase in mind, the Court construes the common-sense definition of "real property" to encompass land and any buildings or permanent fixtures erected upon that land, such as a house. In most ordinary residential real estate transactions, a buyer purchases a home, the fixtures in that home, and the land on which the home is located. What the buyer does not purchase is the previous owner's personal property, such as: electronics, furniture, vehicles, etc.

In that same manner, Black's Law Dictionary defines real property as: "[l]and and anything growing on, attached to, or erected on it, excluding anything that may be severed without injury to the land. Real property can be either corporeal (soil and buildings) or incorporeal (easements)." *Property*, Black's Law Dictionary (10th ed. 2014). Therefore,

the Court construes the phrase "real property" in exclusion j(5) as encompassing the pipeline, including the internal components (flanges and gaskets) since the common-sense understanding of the phrase "real property" refers to the actual land and structures affixed to that land.

This interpretation is supported by the text in an endorsement to the CGL Policy which discusses "real property" and "personal property" and provides, in pertinent part:

> If the Commercial Property Coverage Part or the Farm Property Coverage Form provides coverage for:
> 1. Real property which is used predominantly for residential purposes and consists of one through four dwelling units; and/ or
> 2. Personal property (except business or farm personal property) of a person residing in such real property;

(Doc. 59-1, pg. 12).

There, "real property" unambiguously refers to a building (dwelling unit), whereas "personal property" refers to the property of an individual who resides in that building. Extrapolating this definition to exclusion j(5), "real property" includes the pipeline and all components, i.e. the physical structure and all fixtures, and the land encompassing the pipeline; and "personal property" includes Sunwestern's: tools, construction machinery, heavy-duty construction vehicles, spare parts not affixed to the pipeline, and other miscellaneous inventory. Based on the information provided, the property damage caused by the Incident is damage to real property.

Although Arizona courts have not specifically interpreted exclusion j(5), courts in other jurisdictions have, and tend to favor exclusion. *See e.g. Bradfield v. Mid-Continent Cas. Co.*, 143 F. Supp. 3d 1215, 1244-45 (M.D. Fla. 2015) ("Applying these decisions to the present case, the Court concludes that at the time the purported property damage occurred, Winfree was working on the entire house, including the windows, and thus all property damage that arose from that work is excluded under the j(5) exclusion . . . The Court thus finds that the j(5) and j(6) exclusions operate to preclude coverage for all of the property damage claimed by the Bradfields, and Mid-Continent is entitled to summary

judgment in its favor"); *Travelers Cas. & Sur. Co. v. Dormitory Auth. State of N.Y.*, 732 F. Supp. 2d 347, 365-66 (S.D.N.Y. 2010) ("Exclusion j(5) excludes 'property damage' not merely to the Underlayment, but rather, to 'that particular part of real property' on which Bartec was contemporaneously performing operations: the Flooring System . . . In sum, these provisions exclude not only damage to Bartec's work, but also many kinds of closely related damage, including all of the damages alleged in the Third–Party Complaint for which Travelers seeks coverage, defense, and/or indemnification. As such, Travelers' claims against Assurance must be dismissed."); *Advantage Homebuilding, LLC v. Maryland Cas. Co.*, 470 F.3d 1003, 1009 (10th Cir. 2006) (Tenth Circuit upholding district court decision to interpret exclusion j(5) as applying "to any property damage that occurred while the work on the house was ongoing.").

Therefore, the Court finds that exclusion j(5) and j(6) unambiguously preclude coverage for the Incident and all residual property damage stemming from the Incident. However, the Court notes that exclusions j(5) and j(6) only preclude damage to work that was not yet completed, or still in progress. However, even if Sunwestern completed the Project, another exclusion may apply, and exclusion (l) does.

### C. Exclusion (l).

Exclusion (l) in the CGL Policy excludes:

"Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard".[2]

Exclusion (l) unambiguously precludes coverage for property damage to "work or operations performed by" Sunwestern that is included in the products-completed operations hazard. Put more simply, exclusion (l) precludes coverage for Sunwestern's completed work. Therefore, the combination of exclusion j(5), exclusion j(6), exclusion

---

[2] Exclusion (l) also includes a provision stating that it: "does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor." However, since Sunwestern used no subcontractors, the Court will not address the applicability of this provision. *See* (Doc. 61, pg. 10) ("The work at issue is Sunwestern's, not subcontractors' work.").

(l), and the products-completed operations hazard seemingly preclude any coverage for the Incident whether or not Sunwestern's work was completed. If it was completed, it is excluded by exclusion (l). If it was not completed, it is excluded by exclusions j(5) and j(6).

   *D. Ambiguity of Exclusions.*

   While the exclusions appear to unambiguously deny coverage for Sunwestern's faulty workmanship, Sunwestern argues that the exclusions are ambiguous and, therefore, Sunwestern is entitled to coverage. *See* (Doc. 67, pg. 13) ("Pursuant to its plain language, the 'your work' exclusion applies only when the project is completed. Cincinnati's position is that the Tucson Water Project was not complete. Therefore, exclusion (l) does not apply. Moreover, if the Tucson Water Project was complete, the exclusion is ambiguous as it conflicts with the Completed Operations Coverage."); (Doc. 60, pg. 15) ("A policy containing a definition of Completed Operations coverage, that covers 'your work' and contains a separate 'your work' exclusion, is, on its face, ambiguous."); *id.* at 16 ("Arizona Courts, however, are very likely to find coverage. Insurance policies are read broadly to provide coverage to the insured and ambiguous policy provisions are construed against the insurer in favor of coverage.").

   While no Arizona courts have dealt with this specific issue, courts in various jurisdictions have, and generally reach the same conclusion – that there is no ambiguity between exclusion j(6), exclusion (l), and the products-completed operations hazard, and that policy-holders are not entitled to coverage for their own faulty work. For example, in *Crossen v. Am. Family Mut. Ins. Co.*, Premier, a carpet and floor cleaning business, was insured through a commercial general liability policy with American Family, with relevant terms and exclusions that are identical to the CGL Policy. No. 09-CV-02859-WDM- KLM, 2010 WL 2682103, at *1 (D. Colo. July 7, 2010). Premier was contracted to wash and reseal tile flooring of a home but damaged the floors during the cleaning process. *Id.* American Family denied coverage for that event alleging, among other things, that exclusion j(6) and exclusion (l) prohibited coverage. *Id.* at 5. Like Sunwestern, Premier

claimed that exclusion (l) conflicted with the products-completed operations hazard exception in exclusion j(6) "and therefore create[d] an ambiguity that must be resolved in favor of the insured." *Id.* at 6. Denying that an ambiguity existed between those exclusions, the court wrote:

> The products-operations completed hazard refers to property damage arising out of the insured's work after work is completed, which I understand to mean damage to property other than the insured's work. Exclusion (l) then excludes coverage for damage to the insured's work, which includes work or operations performed by the insured or warranties or representations about the quality of the work. Because these two provisions are not in conflict, I conclude there is no ambiguity.

*Crossen*, 2010 WL 2682103, at *7.

In *Lukes v. Mid-Continent Cas. Co.*, the District Court for the District of Montana reached a similar conclusion regarding the interaction between the allegedly contradictory provisions. There, the Court explained that although exclusion j(6) includes an exception excluding work contained within the products-completed operations hazard, it did not necessarily follow that the existence of the exception meant that work contained within the products-completed operations hazard is covered – only that it is exempted from exclusion j(6). More specifically, the Court held:

> The Lukes maintain that there is a fatal ambiguity between Exclusion j(6) and [exclusion (l)]. They interpret the provision stating that Exclusion j(6) "does not apply to 'property damage' included in the 'products-completed operations hazard,' " to mean that property damage included in the products-completed operations hazard is covered by the Policy. They therefore insist that [exclusion (l)], which excludes coverage for certain property damage included in the products-completed operations hazard, directly contradicts that provision. In interpreting the exception to Exclusion j(6), the Court is not at liberty to add words that were omitted from the policy. The exception merely states that Exclusion j(6) does not apply to property damage included in the products-completed operations hazard. It does not say that property damage included in the products-completed operations hazard is therefore covered by the Policy. Exclusion j(6) does not apply to such property damage, but some other exclusion well might, and [exclusion (l)] does.

No. CV 12-47-M-DLC, 2013 WL 496203, at *5 (D. Mont. Feb. 11, 2013). *See also Auto-Owners Ins. Co. v. Timbersmith, Inc.*, No. 2:12-CV-00786, 2016 WL 3356800, at *6 (D. Utah June 15, 2016), aff'd sub nom. *Auto-Owners Ins. Co. v. Fleming*, 701 F. App'x 738 (10th Cir. 2017) ("[Exclusion (l)] is also best understood by way of illustrative example: A general contractor does some work on a home while the rest is done by subcontractors. The building is accepted by the owner. If the home is later damaged by a fire caused by electrical wiring installed by the subcontractor, the subcontractor exception to exclusion (l) applies and the damage will be covered. If, however, the wiring was installed by the general contractor, the exclusion will apply.").

Sunwestern appears to believe that products-completed operations hazard coverage entitles it to coverage for its own faulty work, if that faulty work led to property damage that ocurred after completion of the Project. However, nowhere in the products-completed operations hazard provision does it state that faulty work is covered. The products-completed operations hazard provision only provides that it: "Includes all 'bodily injury' and 'property damage' occurring away from premises you own or rent and arising out of 'your product' or 'your work.'" (Doc. 59-1, pg. 38).

The products-completed operations hazard provision is still subject to any relevant exclusions and any faulty work that is encompassed in the products-completed operations hazard provision is unambiguously excluded from coverage by exclusion (l). This is consistent with the purpose of a commercial general liability policy. Commercial general liability policies are not intended to protect contractors from liability for their own work. *See Patton v. Mid-Continent Cas. Co.*, No. CV H-15-1371, 2016 WL 11474778, at *7 (S.D. Tex. June 13, 2016), report and recommendation adopted, No. CV H-15-1371, 2016 WL 3900799 (S.D. Tex. July 19, 2016) ("CGL policies do not cover damage to the insured's work or to work performed on the insured's behalf regardless of when the damage occurred because that is not the purpose of CGL coverage. CGL policies do cover damage to the work of others caused by the insured."); *Wilshire Ins. Co. v. RJT Const., LLC*, 581 F.3d 222, 226 (5th Cir. 2009) ("A CGL policy generally protects the insured when his work

damages someone else's property. The 'your work' exclusion prevents a CGL policy from morphing into a performance bond covering an insured's own work."); *Lamar Homes, Inc. v. Mid-Continent Cas. Co.*, 242 S.W.3d 1, 10 (Tex. 2007) ("[F]aulty workmanship will be excluded from coverage by specific exclusions because that is the CGL's structure."); *Crossen*, 2010 WL 2682103, at *6 ("In general, CGL policies exclude coverage for faulty workmanship on the grounds that it is considered a business risk to be borne by the insured.").

Furthermore, Sunwestern's position belies the purpose of the products-completed operations hazard provision. "[The] completed operations hazard provision insures a general contractor against certain risks that occur after a construction project is finished and is in the owner's control. However, exclusions to such a provision typically preclude coverage for damage resulting to a contractor's own work. Thus, the general contractor is covered only for damage to property he or she did not construct. The idea behind this exclusion is that liability insurance should not be a warranty or performance bond for general contractors, because they control their work. The exclusion is thought to discourage careless work by making general contractors pay for losses caused by their own defective work." *Fireguard Sprinkler Sys., Inc. v. Scottsdale Ins. Co.*, 864 F.2d 648, 649-50 (9th Cir. 1988) (internal citations omitted).

Despite the unambiguous nature of the exclusions and the products-completed operations hazard provision, Sunwestern maintains that "[a] policy containing a definition of Completed Operations coverage, that covers 'your work' and contains a separate 'your work' exclusion, is, on its face, ambiguous." (Doc. 60, pg. 15). Sunwestern further alleges that "Courts have held that due to that ambiguity, the work of the insured is covered, and any separate 'your work' exclusion does not apply." *Id.* In support, Sunwestern cites, among other cases: *Mike Hooks, Inc. v. JACO Services, Inc.*, 674 So.2d 1125, 1127-28 (La. App. 1996) and *Kidd v. Logan M. Killen, Inc.*, 640 So.2d 616, 619-20 (La. App. 1994).

*Mike Hooks* and *Kidd* appear to be the last refuge for plaintiffs seeking coverage for faulty workmanship. In *Am. Home Assur. Co. v. AGM Marine Contractors, Inc.*, the

District Court for the District of Massachusetts was faced with an identical scenario, and wrote:

> Citing *Mike Hooks* and *Kidd*, respondent appears to contend that the policy is ambiguous because the two exclusions quoted above take away coverage afforded by the "products-completed operations hazard" provision. But other courts, including the Court of Appeal of Louisiana, have criticized the reasoning of *Mike Hooks* and *Kidd*. See *Joe Banks Drywall & Acoustics, Inc. v. Transcontinental Ins. Co.*, 753 So.2d 980, 985 (La.Ct.App.2000) . . . Similarly, the policy at issue here is not ambiguous because—notwithstanding *Mike Hooks* and *Kidd*—the two exclusions quoted above do not eliminate all the risks covered by the "products-completed operations hazard" provision. This provision, when read with the two exclusions, does not provide coverage for faulty workmanship; instead, it unambiguously provides coverage for damages to persons or other property occurring after completion of the insured's work and away from the insured's premises.

379 F. Supp. 2d 134, 137 (D. Mass. 2005), aff'd, 467 F.3d 810 (1st Cir. 2006).

Although these cases are instructive, none are binding, and "[v]arying judicial interpretations . . . do not automatically render an insurance policy ambiguous." *Employers Mut. Cas. Co. v. DGG & CAR, Inc.*, 183 P.3d 513, 517-18 (Ariz. 2008). However, the Court does not find that the exclusions in the CGL Policy create an ambiguity. Exclusions j(5) and j(6) unambiguously preclude coverage for incorrectly performed work. While exclusion j(5) and j(6) do not preclude coverage for incorrectly performed work that has been completed, exclusion (l) unambiguously does. Therefore, Sunwestern is not entitled to coverage under the CGL Policy for the Incident.

   3. *Are There Any Applicable Exclusions in the UMB Policy?*

As a threshold matter, the UMB Policy includes a provision identical to exclusion (l) in the CGL Policy in section I(B)(7) ("exclusion (7)"). (Doc. 59-2, pg. 7). For the reasons articulated above, exclusion (7) in the UMB Policy precludes property damage for Sunwestern's work that is included within the products-completed operations hazard, i.e. work that has been completed.

The only remaining question is whether the UMB Policy includes an exclusion that precludes coverage for property damage to incomplete work. The UMB Policy has one

- 17 -

such exclusion: exclusion (A)(1)(b).

Exclusion (A)(1)(b) excludes "property damage" to:

> Property being transported, installed, erected, or worked upon by the insured or any contractors or subcontractors working directly or indirectly on any insured's behalf.

(Doc 59-3, pg. 13).

Sunwestern itself concedes that this exclusion encompasses property damage that occurs while work is still in progress and writes:

> Sunwestern was unable to located [sic] any case law interpreting that provision. The above provision, however, addresses property damage occurring while work is occurring. It addresses property "being" transported, installed, etc. It does not address accidents or damages occurring after the work or part of the work has been installed. In this case, the accidents occurred after Sunwestern had installed the pipeline, gaskets, and flanges and during testing. The flanges were not "being worked upon". That provision must be read strictly against the insurer, as it is an exclusion. Nothing within that exclusion explicitly limits coverage to repairs needed after the work fails."

(Doc. 60, pg. 13).

Sunwestern repeats that argument, nearly verbatim, in its Response (Doc. 67) and Reply (Doc. 73). Exclusion (A)(1)(b) unambiguously precludes "property damage" to property that is being actively worked on. While the Court agrees that it does not apply to work that has already been completed, even if the Project was "completed," as has been previously discussed, exclusion (7) of the UMB Policy would preclude coverage. Alternatively, the UMB Policy contains an additional exclusion in section I(B)(5) ("exclusion (5)") that also operates to preclude coverage.

Specifically, exclusion (5) precludes:

> "Property damage" to property owned by any insured, including any costs or expenses incurred by you, or any other person, organization or entity, for repair, replacement, enhancement, restoration or maintenance of such property for any reason, including prevention of injury to a person or damage to another's property.

(Doc. 59-2, pg. 7).

Sunwestern alleges that exclusion (5) does not apply because "Sunwestern did not own the [Project]." (Doc. 60, pg. 14). In its Response, Cincinnati provided evidence that the City was named as an additional insured in both the CGL and UMB Policies. *See* (Doc. 69, pg. 15) ("the City did own the Project and was an additional insured under both the CGL and UMB policies"); *see also* (Doc. 70-2) (Certificate of Liability Insurance naming the City as an additional insured under the CGL and UMB Policies and Affidavit from Cincinnati's Regional Manager of Casualty Claims authenticating the Certificate). Rather than rebutting Cincinnati's claim and evidentiary proof, Sunwestern merely repeats that "Sunwestern did not own [the Project]" in both its Response (Doc. 67, pg. 16) and Reply (Doc. 73, pg. 11). Based on the information provided, the Court is satisfied that: the City was an "additional insured" under the CGL and UMB Policies; the City owned the Project, and; exclusion (5) applies to preclude coverage for the Incident.

Therefore, neither the CGL Policy, nor the UMB Policy provides coverage for the Incident.

### 4. Did Sunwestern Have a Reasonable Expectation of Coverage?

Sunwestern last argues that its "principals and employees had a reasonable expectation that they would be covered for any claim regarding the condition of Sunwestern's work. They were told they had coverage for faulty workmanship and for completed operations. They had been covered for such claims by Cincinnati previously. Under those circumstances, Sunwestern's insurance with Cincinnati covers Tucson Water's claim." (Doc. 60, pg. 17).

Based on Sunwestern's allegations, it appears that its "reasonable expectation" of coverage stems from two places: (1) alleged statements by its insurance broker that "they had coverage for faulty workmanship and for completed operations;" and (2) a prior allegedly related incident where Cincinnati provided coverage.

### A. Insurance Broker Statements.

Much of Sunwestern's alleged expectation of coverage originated from statements made by its own insurance broker, Leon Byrd, and not from Cincinnati directly. Although

Sunwestern incorrectly asserts that Mr. Byrd is Cincinnati's agent, *see* (Doc. 61, pg. 31), the record indicates that Mr. Byrd is affiliated with an independent agency – The Mahoney Group. *See* (Doc. 61-4, pg. 56); (Doc. 61-5, pg. 8); (Doc. 61-6, pg. 50). Mr. Byrd allegedly "explained to Sunwestern each time the insurance renewed, Sunwestern had coverage for its work, for completed operations, and for failures of the work that Sunwestern performed." (Doc. 61, pg. 31).

"The reasonable expectations doctrine, as applied in Arizona, is a rule of construction that enables courts to negate boilerplate terms of an insurance agreement that take away coverage provided for elsewhere in the contract. The doctrine is applied in several situations; for instance, a court can negate a boilerplate term when that term could not be understood by a reasonably intelligent consumer or when an activity by the insurer creates an objective impression of coverage in the mind of a reasonable insured. The doctrine does not, however, operate to add coverage where such coverage is nowhere stated in the policy." *Gregorio v. GEICO Gen. Ins. Co.*, 815 F. Supp. 2d 1097, 1100-01 (D. Ariz. 2011), aff'd, 535 F. App'x 545 (9th Cir. 2013). If Cincinnati had made statements to Sunwestern that it would be covered for its own failures, Sunwestern may have a persuasive argument that it had a reasonable expectation of coverage. Here, the expectation seems to have been created solely by Mr. Byrd and not Cincinnati. Based on Mr. Byrd's statements, the Court finds that Sunwestern did not have a reasonable expectation of coverage.

### B. Prior Incident.

Sunwestern also alleges that it had a reasonable expectation of coverage based upon a prior incident where Cincinnati provided coverage. Sunwestern vaguely describes the incident in its statement of facts and claims that in 2008, after it had completed a project for Metro Water, a pump failed. (Doc. 61, pg. 30). Metro Water made a claim against Sunwestern and Cincinnati later settled that claim. *Id.* at 30-31. Sunwestern alleges that "[a]fter the Metro Water claim, Sunwestern had an understanding that Cincinnati insured claims related to Sunwestern's work." *Id.* According to Cincinnati, that "case involved damages to a structure built by SunWestern [sic] for the Metropolitan Water District. After

completion of the project, flooding damaged the building and associated electronic equipment installed by a subcontractor, and voided warrantees [sic] on the equipment." (Doc. 58, pg. 16-17). Although Cincinnati later settled that case based on completed operations coverage, it alleges that it is unsuitable for comparison because it involved damage to equipment installed by a subcontractor. *Id.*

Rather than rebutting Cincinnati's detailed explanation of the Metro Water case, in its response to Cincinnati's Motion for Summary Judgment, Sunwestern merely reasserts that "[it] had been covered for similar claims by Cincinnati previously" without providing additional detail. (Doc. 67, pg. 17). Based on the information provided, the Court agrees that the Metro Water case is not an apt comparison and does not form the basis for Sunwestern to have a reasonable basis for coverage. As discussed earlier, exclusion (l) contains an explicit exception for work performed by a subcontractor. As the Metro Water case involved equipment installed by a subcontractor, it is unsurprising that Cincinnati was compelled to provide coverage.

The Court finds that this prior incident is distinguishable and does not create a reasonable expectation of coverage for the Incident. *See Aetna Cas. & Sur. Co. v. Dannenfeldt*, 778 F. Supp. 484, 492 (D. Ariz. 1991) ("Arizona law clearly recognizes the reasonable expectations of insureds. Insureds are not bound to unknown terms which are beyond the range of reasonable expectation. But this doctrine has limits. Since most insureds develop a reasonable expectation that every loss will be covered by their policy . . . the reasonable expectation concept must be limited by something more than the fervent hopes usually engendered by loss . . . The expectations to be realized are those that have been induced by the making of a promise.") (internal citations and quotations omitted).

Accordingly, IT IS ORDERED:

1. Plaintiff's Motion for Partial Summary Judgment (Doc. 60) is **denied**.

2. Defendant's Motion for Summary Judgment (Doc. 58) is **granted**.

3. Because the Court concludes as a matter of law that Plaintiff Sunwestern Contractors Incorporated is not entitled to coverage, and that issue is dispositive

of Plaintiff's claims, judgment shall enter in favor of Defendant Cincinnati Indemnity Company and against Plaintiff Sunwestern Contractors Incorporated on all claims.

4.  The Clerk of Court is directed to close its file on this matter.

Dated this 15th day of May, 2019.

_Cindy K. Jorgenson_
Honorable Cindy K. Jorgenson
United States District Judge